IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HAJI JOHNSON,

                Plaintiff,

     v.

DR. JOAN HANNULA, *et al.*,

                Defendants.

OPINION and ORDER

14-cv-155-wmc

State inmate Haji Johnson, now represented *pro bono* by recruited counsel, is proceeding on Eighth Amendment claims against: (1) defendants Joan Hannula and Judith Bentley, a doctor and nurse at Stanley Correctional Institution, for failing to diagnose his ulcerative colitis from August 2008 to February 2011; and (2) defendants Tammy Maassen and Diane Huber, a medical program assistant and manager of the health services unit at Jackson Correctional Institution, for failing to schedule Johnson for medical appointments.[1] Defendants have filed a motion for summary judgment under Fed. R. Civ. P. 56 (dkt. #70), which will now be granted for the reasons set forth below.

---

[1] Plaintiff originally claimed that several other defendants were deliberately indifferent to his medical needs, but voluntarily dismissed his claims against all defendants but Hannula, Bentley, Maassen and Huber. (*See* dkts. #64, 47, 69, 81). Plaintiff also originally claimed that post-diagnosis, Hannula and Bentley were deliberately indifferent to his ulcerative colitis, but plaintiff abandoned that claim in his brief in response to defendants' motion for summary judgment. (Pl.'s Br. (dkt. #82) at 3, n. 1). Accordingly, while defendants are entitled to summary judgment on that claim, the court will not discuss it further in this Opinion.

UNDISPUTED FACTS[2]

## I.     The Parties.

Plaintiff Haji Johnson is an inmate in the custody of the Wisconsin Department of Corrections and currently housed at the Jackson Correctional Institution ("JCI"), where defendant Diane Huber is a medical program assistant associate and defendant Tammy Maassen is a registered nurse and manager of the health services unit.  Johnson was formerly housed at the Stanley Correctional Institution ("SCI"), where defendant Joan Hannula works as a physician and defendant Judith Bentley works as a registered nurse.

## II.    Ulcerative Colitis and Gastrointestinal Disorders.

Ulcerative colitis is a chronic inflammatory bowel disease characterized by inflammation and ulcerations of the mucosal lining of the large intestine, with cycles of remission and relapse.  Symptoms of ulcerative colitis include pain and cramping in the abdomen; gurgling or splashing sounds heard over the intestine; blood and pus in stools, often multiple times a day; fever; feeling a need to pass stools, even though the bowels are empty; and weight loss.  Constipation is not a common symptom of ulcerative colitis.[3]

---

[2] Unless otherwise noted, the court finds the following facts material and undisputed.  The facts are drawn from the parties' proposed findings of fact, as well as the underlying evidentiary support submitted by both sides.

[3] In response to Dr. Hannula's medical opinion to the contrary, plaintiff attempts to dispute whether constipation is a symptom of ulcerative colitis, but as defendants correctly point out, the only "evidence" plaintiff cites in support is inadmissible hearsay.  Although plaintiff has retained a medical expert, Dr. Richard Clarke, plaintiff does not rely on Clarke for the symptoms of ulcerative colitis.  Indeed, nowhere in Clarke's report does Clarke identify the symptoms of

Crohn's disease is another inflammatory bowel disease with similar symptoms, including abnormal bowel movements often associated with blood, abdominal pain, bloating, weight loss and decreased appetite.  An official diagnosis of ulcerative colitis or Crohn's disease requires a colonoscopy and a biopsy of microscopic samples from the intestine, though lab tests can indicate a possible diagnosis of ulcerative colitis or Crohn's, as patients with either disease often have anemia, as well as elevation of inflammatory markers.

Irritable bowel syndrome is associated with abdominal pain, gas and alternating constipation and diarrhea, and sometimes mucous in stools.   It is not an inflammatory bowel disease and is not usually associated with bloody stools.  Irritable bowel syndrome is diagnosed based on a patient's symptoms and not a particular test.

Hemorrhoids are a common condition caused by inflamed veins in the rectum and anus.  Hemorrhoids may cause bloody stools and are often found in conjunction with constipation.  Hemorrhoids may bleed on and off for many years.  External hemorrhoids are diagnosed with visual inspection and internal hemorrhoids with an anoscopy.

---

ulcerative colitis, irritable bowel syndrome or any other gastrointestinal disease, much less list constipation among them.  Instead, plaintiff points to a handout he received from Hannula about ulcerative colitis at an appointment after his diagnosis.  The handout was apparently printed from a website named "www.uptodate.com" and authored by an individual named Mark Peppercorn. According to the handout, symptoms of mild ulcerative colitis may include bouts of constipation. (Dkt. #85-2.)   As defendants correctly point out, however, the printout is inadmissible hearsay offered for the truth of the matter asserted.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial.").

### III.    Plaintiff's Care Before 2008.[4]

In March 2005, Johnson was seen for multiple medical complaints, including diarrhea and bloating.  In April 2005, he was tested for occult (hidden) blood in his stool.  These tests were positive, confirming Johnson had GI bleeding.  On April 8, 2005, a medical provider also performed a rectal exam and noted that plaintiff had internal hemorrhoids.  (Dkt. #73-1 at 5.)  Johnson was further tested for h. pylori during this time frame, but the test was negative.

In August 2006, Johnson complained about diarrhea, but then reported during a subsequent appointment that it was resolved.  (*Id.* at 6.)  In March 2007, Johnson sent a health service request stating that he was having the same type of GI concerns that he'd had in 2005.  At that time, he was given treatment for constipation.  (*Id.*)  In August 2007, Johnson again tested positive for occult GI blooding and a barium enema x-ray was ordered.[5]  The latter x-ray results did not show anything abnormal.

---

[4] In his expert report, plaintiff's medical expert, Dr. Clarke, includes a detailed account of plaintiff's care from 2005 through 2007, as well as opinions regarding deficiencies in care during that time period.  Clarke's analysis of this time period is largely irrelevant, however, because defendants were not involved with plaintiff's care during that period and Clarke points to nothing in plaintiff's medical condition during that period to which defendants were deliberately indifferent.  The court has nevertheless included a brief overview of treatment during this time period to provide context for defendants' subsequent decisions regarding plaintiff's care.

[5] A barium enema is an x-ray exam that can detect changes or abnormalities in the large intestine, including the colon and rectum.  A barium enema would not detect irritable bowel syndrome or hemorrhoids, but may detect diverticulosis, polyps, colon cancers, and inflammatory bowel disease, such as ulcerative colitis or Crohn's disease.  The barium enema test is used much less often than in the past. Colonoscopy is done more often now. (*See* Hannula Dep. (dkt. #95) 41-45; https://www.nlm.nih.gov/medlineplus/ency/article/003817.htm (last visited Feb. 2, 2016).)

**IV.    Plaintiff's Treatment for GI Symptoms While at SCI.**

**A.    2008**

Plaintiff was transferred to SCI sometime before February 2008.  Dr. Hannula was Johnson's assigned treating physician from February 2008 to January 2014.  In addition to seeing Hannula, Johnson also saw nursing staff at various times.  In March and June 2008, Johnson saw a nurse for complaints of constipation.  At the June 2008 appointment, he also mentioned that he had a family history of colon cancer and wanted a colonoscopy.  The nurse scheduled an appointment with Hannula so that Johnson could discuss his request with her.

Johnson saw Hannula for the first time on August 1, 2008.  At the appointment, Johnson discussed his family history of colon cancer.  Hannula noted that Johnson had a 2-3 year history of alternating loose stools, constipation and gas.  She also noted that he had a previous normal result from a barium enema in 2007.  Johnson reported that he currently had a good appetite, no weight loss and no current abdominal pain.  Johnson did not complain of current rectal bleeding.

Upon examination, Johnson presented with a non-tender abdomen and normal bowel sounds.  Hannula did not perform a rectal exam on Johnson because she did not believe it was necessary or appropriate, given his age (31 years old) and lack of complaints about current rectal bleeding.  She also did not think a colonoscopy or additional occult blood testing were necessary given Johnson's age and lack of complaints about current bleeding.  Because symptoms of constipation alternating with loose stools are common signs of irritable bowel syndrome, Hannula further opined that Johnson

possibly had irritable bowel syndrome.  She did not think Johnson's symptoms indicated ulcerative colitis, particularly because (1) he was reporting constipation; (2) he had a normal appetite and weight; (3) his symptoms had remained stable for the past two years; and (4) the barium enema from the previous year had not suggested ulcerative colitis.  Hannula ordered Metamucil for plaintiff's constipation and directed him to schedule a follow-up appointment in two months.

On October 13, 2008, Johnson saw Nurse Bentley for a follow-up appointment. This was the first time Johnson was treated by Bentley.  Johnson told Bentley he was taking Metamucil in the morning and having a daily bowel movement, but that it was small and hard.  He further reported no abdominal discomfort and a good appetite. Based on her evaluation at that time, Bentley assessed Johnson as having probable irritable bowel syndrome.  She ordered him to take Docusate tablets once a day to soften his stool and told him to schedule another follow-up appointment in two months.

On December 12, 2008, Nurse Bentley again assessed Johnson during a follow-up appointment. Johnson reported having no real desire to have a bowel movement, and Bentley once again concluded that Johnson probably had irritable bowel syndrome.  She changed his order from Docusate to Senna for constipation, the latter of which encourages evacuation of the stool.  On December 27, 2008, Johnson saw a nurse for complaints of abdominal pain and continued constipation.  He told the nurse he wished to discontinue Senna because it was not helping.

B.     2009

On January 23, 2009, Johnson saw another nurse for complaints of his stomach

6

"bubbling all the time," bowel movements mixed with mucous and blood, frequent constipation and occasional diarrhea.  He also reported a good appetite and fluid intake. Johnson requested Docusate for his constipation.  The nurse scheduled a follow-up appointment with the nurse practitioner for February 5, 2009, but Johnson did not show up for it.[6]

On March 4, 2009, Johnson was scheduled for another appointment with Bentley based on a health service request he submitted on February 13, 2009, concerning blood in his stools. Johnson appeared anxious to Bentley at the March 4, 2009 appointment. In particular, he mentioned having some of the symptoms described in the written material he received about irritable bowel syndrome, but also had additional symptoms of bloody/orange stools.  He reported oftentimes not having a complete bowel movement, which made him feel full all day.  Johnson mentioned using Metamucil, which gave him some relief from constipation, and that he was no longer having episodes of diarrhea. Johnson also reminded Bentley that he had had symptoms for three years and that he felt ignored when submitting health service requests.

After Bentley took Johnson's vitals and reviewed his chart, she noted that two different providers had found probable irritable bowel syndrome, but that Johnson did not believe the diagnosis and did not want treatment for irritable bowel syndrome. Indeed, he did not want to try anything, other than Metamucil and more testing. Bentley told Johnson that he could increase his Metamucil to two or three times a day to possibly improve constipation.  She also ordered an occult stool test to check for blood

---

[6] The record does not disclose why Johnson missed this appointment.

and discussed Johnson's symptoms with him, advising Johnson at the time that his symptoms were not suggestive of him having pathology (i.e., a particular disease), especially with him maintaining his weight and having a good appetite. Bentley nevertheless scheduled a follow-up appointment with Dr. Hannula.

On April 1, 2009, Johnson was scheduled for a follow-up appointment with Hannula, but did not show up.[7]  On April 24, Johnson was seen by Hannula for this re-scheduled appointment. Hannula had received the results from the occult stool test, showing that Johnson had blood in his stool. At the appointment, Johnson reported having some bright red blood in his stools in the recent past, but that it had resolved and he was not experiencing any other symptoms that day. He also reported having formed stools and a normal appetite.

On April 24, 2009, Hannula concluded that the blood in Johnson's stool was likely related to a hemorrhoid, given that: (1) he was not currently bleeding; (2) he had been previously diagnosed with hemorrhoids by rectal exam in 2005; and (3) hemorrhoids can bleed on and off for many years. Hannula also concluded that because Johnson's symptoms were similar to those he'd had for the past few years, he still likely had irritable bowel syndrome. She also noted that because Johnson reported feeling well, health services would follow up with him upon request.

On June 8, 2009, Johnson was seen by Hannula for an appointment after he submitted a health service request complaining of gas. Johnson reported that he felt well, had a good appetite, no cramping and normal bowel movements, but that he had a lot of

---

[7] Again, there is nothing to suggest this "no show" was defendant's fault.

gas.  Hannula provided Johnson with anti-gas medications.  She noted a diagnosis of probable irritable bowel syndrome and told Johnson to contact health services for a follow-up as needed.

On October 28, 2009, Johnson was scheduled for an appointment with Bentley per his request because he wanted to discuss adding a diet tray for high fiber.  Johnson reported that he was using Citrucel (for constipation), having a bowel movement daily and that his stools were formed.  Bentley told him that all meals/diets already have 30g of fiber, but that he could use Citrucel twice a day if he found himself constipated.  Once again, Bentley assessed Johnson as having probable irritable bowel syndrome that was controlled, and she did not find it necessary for further follow-up because he was not reporting worsening symptoms or pain.

On December 9, 2009, Johnson had a visit with a nurse for complaints of diarrhea, bloating and gas.

### C.    Late 2010

Johnson did not submit a request complaining of GI issues for another year.  On December 3, 2010, however, he submitting a request complaining of abdominal pain and bleeding.  He saw a nurse for those complaints on December 4, but refused a rectal exam to check for hemorrhoids and refused any treatment.  He was scheduled for an appointment with a doctor or nurse practitioner on December 16, but missed the appointment.  He then had appointments with nurses on December 24 and 27, complaining of diarrhea, abdominal pain, and rectal urgency.  After these appointments, tests were ordered of his blood and stool.  On December 31, the lab reported a positive

9

test for occult blood in Johnson's stool but normal results for the blood work, including a normal white blood cell count, normal levels of hemoglobin and hematocrit, and normal sedimentation rate.

### D.    2011

On January 10, 2011, Nurse Bentley saw Johnson in response to his concerns about abdominal discomfort and diarrhea.  Johnson reported that he only had diarrhea, and no longer had alternating constipation.  He also reported, however, having less appetite, dizziness and fatigue.  He was concerned about his abdominal issues, unintentional weight loss and colon cancer.

Bentley noted in Johnson's chart that he had occult blood in his stools, but that recent lab work had returned normal results.  Bentley assessed Johnson has having either irritable bowel syndrome or celiac disease and ordered loperamide, which is an anti-diarrhea medication.  Bentley further noted that she found "nothing concerning."  Even so, she ordered a colonoscopy for Johnson and a check for anti-tissue transglutaminase antibodies, which would check for celiac disease.  Finally, Bentley did not believe Johnson had ulcerative colitis or Crohn's disease, because his blood work results came back normal.[8]

On January 14 and 17, 2011, Johnson had additional nurse visits in response to his complaints of continued diarrhea with blood and mucous despite the anti-diarrhea medication Bentley had provided.  In response, Johnson was given Pepto-Bismol and a

---

[8] Common signs of ulcerative colitis would include blood work showing an elevated sedimentation rate and CRP level, and possibly lower hemoglobin and hematocrit.

handout on celiac disease.  On January 19, the lab test for celiac disease antibodies was negative.  On January 20, Johnson submitted another health service request for diarrhea.

On January 21, 2011, Dr. Hannula again saw Johnson.  Johnson reported that for approximately two months, he had been suffering from frequent diarrhea, multiple night wakings, losing weight and poor appetite.  Johnson did not, however, report constipation. Given that this was the first time Johnson had reported to Dr. Hannula that he had diarrhea without constipation, Hannula suspected that Johnson had ulcerative colitis. Nevertheless, since Johnson was already scheduled to have a colonoscopy, which would be the primary tool to diagnose ulcerative colitis, Hannula added an esophagogastroduodenoscopy ("EGD") to his colonoscopy order, and she also ordered repeated blood and lab work.[9]  Hannula ordered the EGD to diagnose other potential causes of Johnson's symptoms, including Crohn's disease.

Johnson saw Dr. Hannula again one week later.  On January 27, 2011, Johnson provided stool samples at the appointment, and Hannula noted that the samples were liquid and blood-tinged.  Hannula had Johnson stay in the health services unit for a few hours to collect further samples, in which he apparently had three bloody stools in three hours, mixed with a small amount of mucous.  As a result this appointment, Hannula felt that Johnson's symptoms presented most consistent with ulcerative colitis.  Although ulcerative colitis could not be confirmed without a colonoscopy (which was scheduled for the following week), Dr. Hannula started Johnson on medications for ulcerative colitis, assuring him that:  (1) a nurse would be checking his weight over the following days; (2)

---

[9] An EGD is a test to examine the lining of the esophagus, stomach, and first part of the small intestine.

11

he would have a follow-up with her in four days; and (3) she would order a GI consult.

On January 31, 2011, Johnson saw Hannula for a follow-up appointment.  His bowel movements had decreased and he reported feeling better after starting the new medications. His vital were taken and his weight had increased by six pounds.  Even so, his colonoscopy was still scheduled for February 2, 2011, and Hannula indicated that she would follow-up with the results.

On February 3, 2011, the results from Johnson's colonoscopy confirmed ulcerative colitis.  Due to these results, Johnson remained on his current medications, to which Dr. Hannula added other medications.  While Johnson reported that his loose stools continued to decrease, Dr. Hannula was still not yet sure of the extent of his ulcerative colitis without receipt of the final report.  At that time, Johnson was also to schedule a follow-up appointment in two weeks.  Since then, and until he transferred to a different prison, Johnson continued to have follow-up appointments with Hannula and other health services staff regarding his ulcerative colitis condition and any other concerns.

**V.      Plaintiff's Remicade Infusions at JCI.**

Before being transferred from SCI to JCI on January 15, 2014, Johnson had been admitted to the hospital, where it was determined that he needed a more aggressive treatment for his ulcerative colitis.  He was ordered to receive Remicade infusions every eight weeks.  Upon arrival at JCI, Johnson was already receiving scheduled Remicade infusions.  When he was transferred to JCI, he was scheduled to have his Remicade appointments off-site at Black River Memorial Hospital.

The medical program assistant associate ("MPAA") at JCI, defendant Diane

Huber, is responsible for scheduling offsite appointments.  Before Huber may do so, however, the treating provider has to write the order for treatment in the inmate's "prescriber's orders."  The inmate's chart then goes to a nurse to transcribe, sign off on and flag for Huber to schedule the treatment.  When a chart is flagged, this is an alert to Huber to schedule an offsite appointment.  If an inmate's order for offsite treatment is not flagged, Huber has no way of knowing that action needs to be taken on her part, unless she receives a complaint from an inmate.  When an inmate returns from an offsite appointment with recommendations for further offsite treatment, the proper procedure is for the request to get flagged.  Once a physician or nurse practitioner review the request, they write any orders, if they agree with the outside provider's recommendations.

In October 2014, Huber scheduled a series of four Remicade treatments for Johnson.  She scheduled four appointments at once because the prescriber's order was only written for twelve months, and the hospital usually only allows appointments to be scheduled for six to twelve months in advance.  Johnson's March 30, 2015, Remicade treatment was the last treatment scheduled in this series.  He returned from that appointment with an offsite service request indicating that another appointment was to be scheduled for eight weeks.  The offsite service request was reviewed and initialed by a nurse practitioner, but the nurse practitioner never wrote any orders *and* never flagged the chart for a nurse.  Thus, the order was never completed by a nurse and the chart was not flagged for Huber to schedule more offsite appointments.  In other words, Huber was never notified that she needed to schedule further Remicade appointments.

On May 29, 2015, Johnson submitted a health service stating that he was

13

supposed to have received a Remicade infusion that week. Although the nurse responded that the request was "Referred to MPAA [Huber] for appointment date," the request was in fact never forwarded to Huber and no appointments were scheduled. On June 13, 2015, Johnson submitted a medication refill request indicating that his Remicade treatment was three weeks late. A nurse responded that he would be notified when his next Remicade appointment was scheduled. Unfortunately, *Huber* was apparently never notified of (and never received a copy of) the June 13, 2015, medication refill request.[10]

That same day, Johnson submitted a health service request directly to Huber stating that: (1) it had been 11 weeks since his last Remicade treatment; and (2) he needed to be sent out for treatment so he did not relapse. This was the first time Huber had heard about the delay. Huber responded that she would schedule his Remicade treatments for every eight weeks until December 2015. She immediately worked on getting the appropriate orders written by the physician. Once the prescriber's order was written and entered by a nurse, Huber was able to schedule the series of appointments.

Meanwhile, on June 15, 2015, Johnson had written a letter to defendant Tammy Maassen, as health services manager, complaining that he had been waiting three weeks beyond when his Remicade treatment should have been scheduled. Johnson asked Maassen to make sure he received the treatment immediately so he would not begin to relapse. After looking into his complaints, Maassen learned that the issue had been

---

[10] Defendants assert that JCI has been working on updating the practice for triaging health service requests submitted by inmates. Currently, all health service requests are triaged by nursing staff and requests regarding Remicade treatment should be forwarded to the MPAA. The new procedure requires that health service requests requiring off-site appointments be directly addressed to the MPAA. A reminder system has already been implemented, using Outlook to notify staff when it is time to schedule the next series of appointments.

resolved and Johnson's Remicade appointments had been scheduled for the remainder of the year. Maassen responded to Johnson informing him that his appointments have been scheduled for the remainder of 2015.

Johnson received his next Remicade treatment on June 19, 2015.

## OPINION

The states have an affirmative duty to provide medical care to their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to the serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* at 104. To succeed on an Eighth Amendment medical care claim, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000).

While all of the parties agree that ulcerative colitis is an objectively serious medical condition, plaintiff argues, and defendants deny, that the medical treatment afforded him shows deliberate indifference. He has two specific claims of deliberate indifference: (1) the failure of Dr. Hannula and Nurse Bentley at SCI to properly diagnose and treat his ulcerative colitis from 2008 to 2011; and (2) the failure of Medical Program Assistant Associate Maassen and Health Service Director Huber at JCI to schedule timely infusions of Remicade. To succeed on a deliberate indifference claim against medical providers, however, he must show more than mere negligence.

Deliberate indifference is not medical malpractice; the Eighth Amendment does

not codify common law torts.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.")   Disagreement with a doctor's medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim.  *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

While deliberate indifference means more than negligent acts, it is something less than purposeful ones.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference."  *Id.* at 837.  A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  *See also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was "blatantly inappropriate.")   Here, however, plaintiff has insufficient evidence to permit a reasonable jury from making that inference.

I.    **Dr. Hannula and Nurse Bentley's Failure to Diagnose Ulcerative Colitis.**

The jist of plaintiff's argument against Hannula and Bentley is that they should have ordered a colonoscopy and other diagnostic tests as soon as they learned that plaintiff had unexplained blood in his GI tract in conjunction with other GI distress.

Plaintiff contends that the failure to do so shows deliberate indifference, at least when coupled with the continued treatment for constipation, adherence to the irritable bowel syndrome diagnosis, and failure to schedule more frequent follow-up appointments. Even construing the evidence in the light most favorable to plaintiff, however, the facts do not support this argument.

Perhaps plaintiff's strongest undisputed fact is that between February 2008, when Hannula and Bentley began treating him, and February 3, 2011, when he was diagnosed with ulcerative colitis, plaintiff complained to medical staff approximately 20 times about GI pain or trouble. Even so, the majority of his complaints were *not* about symptoms that would have suggested ulcerative colitis or any other serious diagnosis. During 2008, most of his complaints were about constipation. Moreover, he reported feeling well and having a good appetite during this period. He also reported *no* unexplained weight loss, blood in his stool or severe abdominal pain. Accordingly, Dr. Hannula and Nurse Bentley both believed that his symptoms suggested irritable bowel syndrome and possibly hemorrhoids. Plaintiff has adduced no evidence suggesting that their diagnoses were unreasonable or even incorrect. Further, the facts show that Hannula and Bentley consistently provided treatment for plaintiff's symptoms, and that Hannula and Bentley chose not to order additional testing because they did not think it necessary or appropriate to order testing for someone of plaintiff's age who had constipation and a concern about a family history of cancer, but generally reported feeling well.

Even in January, February and March of 2009, when plaintiff again complained of diarrhea, mucous and blood in his stools, he also complained of continued constipation.

17

Since this seemed consistent with irritable bowel syndrome and hemorrhoids, Hannula and Bentley continued to treat him accordingly.  Plaintiff did not make similar complaints about diarrhea with bleeding again until December 3, 2010, and even then, there is no evidence that Hannula or Bentley had notice of these complaints.  Moreover, plaintiff refused a rectal exam at his December 4 appointment that may have helped determine whether his bleeding was attributable to hemorrhoids.

As a result, there is no evidence that Hannula or Bentley learned of plaintiff's worsening symptoms until January of 2011.  At his January 10, 2011 appointment with Bentley, plaintiff complained of diarrhea without constipation, less appetite, dizziness and unintentional weight loss.  The contemporaneous treatment notes indicate that these complaints were markedly different than his previous complaints.

These notes also show that Bentley responded to this change:  she reviewed his recent lab results, ordered further tests to check for celiac disease, ordered a colonoscopy and provided anti-diarrheal medication.  Similarly, when Dr. Hannula learned of plaintiff's worsening condition and new symptoms on January 21, she acted on her suspicion of ulcerative colitis.  In particular, since plaintiff was already scheduled for a colonoscopy, Hannula also ordered an EGD and repeat blood and lab work.  A few days later, Hannula collected stool samples from plaintiff, starting him on medications for ulcerative colitis, which helped plaintiff feel better almost immediately.

Given this history of plaintiff's symptoms and the ongoing care provided by Hannula and Bentley, however imperfect it may have been in hindsight, no reasonable jury could find that their failure to perform or order invasive tests, such as rectal exams or

18

a colonoscopy, was "blatantly inappropriate" or showed complete lack of medical judgment. Rather, the facts show that Hannula and Bentley's treatment and assessment of plaintiff were supported by plaintiff's presentation at each of his appointments with them.

Plaintiff relies on Dr. Clarke's expert report as the sole basis for his argument that Hannula and Bentley were deliberately indifferent to plaintiff. Despite Dr. Clarke's qualifications and expertise, however, his report does not justify a different view of the facts here. First, Dr. Clarke never identifies the symptoms of ulcerative colitis, irritable bowel syndrome or any other GI disorder. This deficiency is significant, because without an expert to identify the common symptoms of these diseases, plaintiff has no support for his argument that Hannula and Bentley were deliberately indifferent when they failed to diagnose ulcerative colitis sooner. In other words, no reasonable jury could accept plaintiff's suggestion that Hannula and Bentley should have suspected ulcerative colitis before 2011 when there is *no* evidence in the record suggesting that plaintiff even had ulcerative colitis before December 2010. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996) (affirming summary judgment to prison medical staff on prisoner's Eighth Amendment claim that defendants failed to diagnose hemorrhage when plaintiff's symptoms did not make it obvious that he had suffered a hemorrhage); *Turner v. Cox*, 569 F. App'x 463, 467-68 (7th Cir. 2014) (defendants' failure to test for h. pylori earlier was not deliberate indifference where plaintiff had not submitted evidence that his earlier symptoms were even consistent with h. pylori).

Additionally, Dr. Clarke does not dispute that plaintiff was exhibiting symptoms

19

of irritable bowel syndrome and hemorrhoids.  In particular, he does not deny that constipation alternating with loose stools, such as plaintiff was experiencing, are common symptoms of irritable bowel syndrome or that hemorrhoids can bleed off and on for years.  He also does not dispute that positive occult blood results can be the result of a number of different conditions, with the most common for young patients being hemorrhoids or anal fissures.  (*See* Hannula Dep., dkt. #95, at 33-35.)  Nor does Clarke directly dispute Hannula and Bentley's opinion that plaintiff's symptoms appeared to remain relatively stable until late 2010, when they changed significantly.  Finally, Clarke never disputes that, if plaintiff was indeed suffering from irritable bowel syndrome and hemorrhoids until late 2010, Hannula and Bentley provided the correct treatment for those disorders.

Without such contrary opinions, Dr. Clarke's report does not raise a genuine factual dispute about the appropriateness of Dr. Hannula's and Nurse Bentley's treatment of plaintiff, let alone whether they were deliberately indifferent.  *See, e.g., Ray v. Wexford Health Sources, Inc.,* 706 F.3d 864, 866 (7th Cir. 2013) ("Ray does not deny that, if his pain stems from arthritis, his treatment is appropriate."); *Mlaska v. Talbot*, 571 F. App'x 483, 486-87 (7th Cir. 2014) ("So long as Talbot's diagnosis was consistent with Mlaska's symptoms, and Talbot thought he was appropriately treating them (and the record does not suggest otherwise), he was not deliberately indifferent.")

At most, Dr. Clarke's opinions boil down to his opinion that Hannula and Bentley should have performed more rectal exams and ordered more tests (specifically, a colonoscopy and possibly more lab tests) to determine the cause of the blood in

20

plaintiff's stool stemming back to 2005. Clarke's opinions, however, fail to address the reasons Dr. Hannula and Nurse Bentley have given for declining to order additional tests. In particular, Clarke ignores the long periods of time where plaintiff's symptoms were either resolved, or at least controlled, by the treatment provided by Hannula and Bentley. Although Clarke suggests that plaintiff suffered from continuous bleeding, pain or other symptoms that remained unexplained from 2005 to February 2011, when he was ultimately diagnosed with ulcerative colitis, this is simply not supported by the undisputed facts. Rather, the facts show that there were lengthy periods between 2005 and late 2010 in which plaintiff reported no serious symptoms at all, instead he reported feeling well. Clarke's opinions also seem to assume that even if plaintiff had periods in which he felt well, Hannula and Bentley should have done more to determine what had caused his previous bleeding. Again, however, Clarke ignores that Hannula and Bentley's assessment of and periodic treatment for probable irritable bowel syndrome with hemorrhoids *did* take into account plaintiff's intermittent symptoms and test results stemming back to 2005. Finally, Clarke never states in his report that an assessment of probable irritable bowel syndrome with hemorrhoids is *inconsistent* with plaintiff's intermittent symptoms from 2005 to late 2010, at which time his symptoms clearly worsened.

Ultimately, Clarke's opinions constitute a difference of opinion between medical providers, which is not enough to go forward to trial. *See Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015) ("evidence that another doctor would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim"); *see also*

21

*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."); *Pyles*, 771 F.3d at 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'") (*quoting Estelle*, 429 U.S. at 107); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000) ("A doctor might be careless in not appreciating the need to investigate several possible explanations for a particular prisoner's symptoms, and this carelessness may constitute malpractice. But malpractice alone is not enough to meet the constitutional standard.")

Although Dr. Clarke opines that more diagnostic testing would have been appropriate, Hannula and Bentley believed it was unnecessary, and even risky, to order an invasive test, such as a colonoscopy, without more compelling symptoms, particularly where the barium enema in 2007 had shown no signs of cancer, ulcerative colitis or Crohn's disease. *See, e.g.*, Hannula Dep. at 70:22-24 ("[A] colonoscopy is an invasive test, so there needs to be an indication for one. There was no indication at this point for a colonoscopy."); 78:13-22 (Hannula believed plaintiff was suffering from hemorrhoids based on "[t]he positive occult blood test with a negative barium enema [and results of previous] rectal exam[,] . . . Hemorrhoids will give you positive occult blood. Hemorrhoids will bleed on and off. So the barium enema ruled out any serious underlying pathology, so the positive hemoccults were probably explained most likely by hemorrhoids.")

Plaintiff's reliance on *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), is also not

helpful.  In *Greeno*, the inmate visited a prison doctor complaining of severe heartburn and vomiting.  The doctor made notes on two separate occasions to rule out a chronic peptic ulcer and gastro-esophageal reflux disease, but never did so.  Instead, the inmate was prescribed several medications to treat his heartburn and antacids for his vomiting.  Despite this treatment actually making Greeno's condition worse, a fact he communicated to his doctors, no effort was made to find an underlying cause for his discomfort.  On the contrary, at some point, medical personnel denied him treatment altogether.  After months of ineffective treatment, a specialist eventually tested him for an esophageal ulcer.  When those tests came back positive for a distal ulcer, Greeno was finally properly treated.  To compound matters, the months of taking antacids had caused damage to Greeno's colon and bowels.  *Id.* at 650-51.

The Seventh Circuit held that this evidence was sufficient to find the medical staff treating Greeno was subjectively indifferent to his serious medical condition.  Central to that holding, however, was the fact that "[t]he possibility of an ulcer was first noted in Greeno's chart in August 1995" after which "the defendants doggedly persisted in a course of treatment known to be ineffective."  *Id.* at 655.  Indeed, the contemporaneous evidence was overwhelming that the course of treatment prescribed Greeno was not effective, and that he repeatedly complained of worsening symptoms to medical staff over the course of a year.  Despite this evidence, the medical staff became increasingly frustrated with Greeno's requests for treatment, refused to alter his treatment when the condition became worse, and even denied him further medication at one point.

Unlike in *Greeno*, there is no evidence here that Dr. Hannula or Nurse Bentley

thought ulcerative colitis was a possibility, given their diagnosis of probable irritable bowel syndrome and hemorrhoids, nor that the course of prescribed treatment was unhelpful, much less worsening his condition.  Neither is there evidence that plaintiff's symptoms were obviously attributable to ulcerative colitis.  The evidence here indicates that unlike the medical staff in *Greeno*, Hannula and Bentley repeatedly assessed and treated plaintiff's condition.

If anything, plaintiff's case is similar to *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008).  In that case, an inmate with bladder cancer sued two different doctors, both of whom had failed to diagnose the cancer and instead treated him for a gross hematuria.  Nevertheless, the Seventh Circuit found no evidence of deliberate indifference.  In particular, there was no evidence that one of the doctors ever suspected cancer, nor that his failure to order additional testing or pursue a "more aggressive treatment" was the product of deliberate indifference.  *Id.* at 680.  As for the other doctor, he "was aware that cancer was a risk but erroneously thought that another condition was more likely causing Duckworth's symptoms."  *Id.*  Thus, he continued to provide treatment to Duckworth for the other condition.

The Seventh Circuit explained that this was not deliberate indifference because the evidence established that the doctor "tried to cure what he thought was wrong with Duckworth, an opinion he arrived at using medical judgment."  *Id.* at 681.  The court reached this conclusion despite a report from an expert urologist who stated that "cancer should always be ruled out first before other conditions when a patient has gross hematuria."  *Id.*  The court concluded that, "[t]his may be a fair statement of how a

reasonable doctor would treat Duckworth's symptoms, but it does not shed any light into [the doctor's] state of mind.  Nor did [the doctor's] chosen course of treatment so depart from accepted professional practice as to allow the jury to infer indifference." *Id.*

So, too, here.  The undisputed records shows that Hannula and Bentley tried to treat what they thought was wrong with plaintiff.  In the face of Hannula's and Bentley's reasonable, if possibly mistaken, explanations for their respective care decisions, and the lack of any evidence suggesting that their care decisions were "blatantly inappropriate," or so departed from accepted professional practice as to infer indifference, a reasonable jury could not find that in deciding not to order additional tests or perform additional exams, defendants Hannula and Bentley failed to use medical judgment at all or that their judgment was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole*, 94 F.3d at 261–62.  Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim against Hannula and Bentley.

## II.    Maassen and Huber's Failure to Schedule Timely Remicade Infusions.[11]

---

[11] Plaintiff argues in his opposition brief that he is pursuing a claim against Maassen and Huber related to delayed "Remicade infusions" in the fall of 2014.  (Pl.'s Br. at 18.)  However, plaintiff never pled such a claim against Maassen and Huber.  Instead, plaintiff was granted leave to amend his complaint on March 3, 2015, to add a claim against "Eric Doe" (later identified as Eric Stugen) regarding a delayed Remicade treatment in the fall of 2014.  (Dkt. #49.)  Moreover, plaintiff's proposed amended contained no allegations against Maassen or Huber, who were not defendants in the case at the time.  While plaintiff later sought, and was granted, leave to add claims against Maassen and Huber regarding a delayed Remicade infusion in the summer of 2015 (dkt. ##61, 66), he instead voluntarily dismissed his claim against Eric Stugen without ever asserting a claim against Maassen and Huber based on an alleged fall of 2014 delay.  Accordingly, the court will not consider plaintiff's arguments relating to that claim.

On this record, entry of summary judgment is even more compelling as to plaintiff's claims against defendants Maasen and Huber. Plaintiff alleges that Maassen and Huber were deliberately indifferent to his serious medical needs because there was a delay in his Remicade infusion in the summer of 2015. Plaintiff was supposed to receive the infusion around May 21, 2015, but actually received it on June 19. Plaintiff now contends that this delay caused his ulcerative colitis to become "mildly symptomatic."

This claim fails for two reasons. First, plaintiff has failed to show that he had a serious medical need for the Remicade infusions every eight weeks. Defendants correctly point out that in this instance, the relevant "medical need" was not plaintiff's ulcerative colitis itself, but the medication used to treat it some three weeks sooner. The Seventh Circuit has explained that, "[i]n cases where prison officials delayed rather than denied medical assistance to an inmate," the plaintiff must "offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Conley v. Birch,* 796 F.3d 742, 749 (7th Cir. 2015) (citing *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)). Here, plaintiff has offered no medical evidence that the delay caused the mild flare-up in symptoms. His expert, Dr. Clarke, offers no testimony in support of this claim, and plaintiff points to no other source of evidence to support his argument. For example, he has no evidence that he requested treatment or complained about symptoms during this time. He has not even submitted testimony in the form of a declaration stating that he suffered a flare-up.

Even if plaintiff had shown a serious medical need for the infusions every eight weeks *and* that he suffered harm from the three-week delay, plaintiff has shown at most

that Maassen or Huber acted negligently in responding to that need, not that they were deliberately indifferent to it.  The evidence shows that in October 2014, Huber scheduled four Remicade treatments for plaintiff.  His last appointment for the four treatments scheduled by Huber was March 30, 2015.  After his March 30 appointment, plaintiff returned with an offsite service request that indicated he should be scheduled for another appointment in eight weeks.

Plaintiff argues that Maassen and Huber were deliberately indifferent for failing to schedule further infusions after he returned with the offsite service request, but Huber could not be expected to schedule appointments she knows nothing about.  On the contrary, while institution procedures mandated that a physician or nurse practitioner must review offsite service requests, and write any orders necessary if they agree with the outside provider's recommendations, the record appears to suggest that no physician or nurse practitioner wrote an order for the next set of Remicade treatments.  As a result, Huber did not know she was supposed to schedule them.  In fact, Huber did not learn that plaintiff's Remicade infusions were past due until she received his health service request directed to her on June 13, 2015.  After she received the request, the record shows she immediately began work to secure appropriate orders, and schedule his Remicade appointments going forward as well.  With respect to Maassen, she did not learn about the delayed Remicade treatments until June 15, 2015, when she received a letter from plaintiff.  Upon looking into his complaint, she then learned that Huber had already resolved the issue by scheduling appointments for the remainder of 2015, something Maassen then reported to plaintiff.

27

In short, plaintiff has no evidence that Huber or Maassen were responsible for the delayed Remicade treatments.   Accordingly, plaintiff has not shown that they were deliberately indifference.  Defendants are entitled to summary judgment on this claim.


ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #70) is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 9th day of February, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge